IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JOHNATHON WRIGHT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:24-cv-00559-DGK |
| ) | |
| THE KANSAS CITY SOUTHERN ) | |
| RAILWAY COMPANY, ) | |
| ) | |
| Defendant. ) | |

**ORDER GRANTING SUMMARY JUDGMENT**

This case arises under the Family Medical Leave Act ("FMLA"). Plaintiff Johnathon Wright alleges that Defendant The Kansas City Southern Railway Company violated the FMLA when it terminated him for taking approved leave for his medical condition.

Now before the Court is Defendant's Motion for Summary Judgment. ECF No. 46. Because there is no genuine dispute of material fact, the motion is GRANTED.

**Standard**

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court makes this determination by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

"In reaching its decision, a court should not weigh the evidence, make credibility

determinations, or attempt to determine the truth of the matter." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). To survive summary judgment, the nonmoving party must substantiate his allegations with "sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotations and citations omitted).

**Undisputed Material Facts**

To resolve the motion, the Court must first determine the undisputed material facts. The Court has limited the facts to those that are undisputed and material to the pending summary judgment motion. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has excluded legal conclusions, arguments presented as fact, and proposed facts not properly supported by the record or admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). However, the Court has included inferences from undisputed material facts and facts the opposing party has not controverted properly. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

Defendant and affiliated railroads provide freight rail transportation throughout North America under the brand name CPKC. Defendant is largely unionized, with all non-management employees represented by labor unions with which Defendant has collective bargaining agreements ("CBAs") that govern those employees' terms and conditions of employment.

Defendant employed Plaintiff as a train conductor from August 2021 through his dismissal from service on August 9, 2024. Plaintiff was a member of the Brotherhood of Locomotive Engineers and Trainmen (the "Union").

Defendant's railroad operations and the conduct of its employees are governed by numerous safety rules, federal regulations, and Company policies, orders, and directives, including the General Code of Operating Rules ("GCOR"), which is a set of operating rules for numerous

2

railroads in the United States intended to enhance railroad safety. Plaintiff was required to know and follow the GCOR, and he carried a copy of the GCOR to reference when at work.

GCOR Rule 1.6, titled "Conduct," prohibits employees from being dishonest and immoral, among other things. GCOR 1.6 states in full:

Employees must not be:

1. Careless of the safety of themselves or others.

2. Negligent.

3. Insubordinate.

4. Dishonest.

5. Immoral.

6. Quarrelsome

or

7. Discourteous.

Plaintiff was, and other employees are, subject to Defendant's FMLA Policy. The FMLA Policy details Defendant's employees' entitlements and duties to Defendant under the FMLA. The FMLA Policy states, in relevant part, that

> The Company prohibits retaliation against employees for exercising their FMLA rights. However, employees who are determined, following a formal investigation, to have been dishonest in connection with their application for or use of FMLA will be subject to disciplinary action, up to and including dismissal.

Plaintiff worked in Kendleton, Texas, where he primarily worked as a train conductor. His job duties included tasks such as walking on even and/or uneven surfaces for up to four miles a day, lifting and carrying objects exceeding 80 pounds, and climbing stairs and ladders. As a conductor, he was responsible for safe train operation, and good vision was required for him to

3

perform his job.

Plaintiff's work schedule varied depending on how busy the Kendleton depot was. Generally, once he and other conductors finished a work shift—and after a federally mandated rest period—they would be added to the bottom of a list of employees available to be called to a train crew, called the "extra board." Conductors at the top of the extra board are called back to service first; as employees are called to service, other employees advance up the extra board until they also are called to service. As a result, the frequency of when Plaintiff would be called to service depended on the volume and pace of shipping through the Kendleton depot. Once called to service, Plaintiff would be away from home for an unpredictable period of time. Plaintiff testified that it could be as long as four days, as he would work on a train that left Kendleton and return only when there was a crew needed for a train headed back to Kendleton.

Defendant approved Plaintiff to take intermittent leave under the FMLA beginning in August 2022 due to a 2018 diagnosis for myasthenia gravis. Myasthenia gravis is a chronic autoimmune disease that interferes with the communication between the nervous system and muscles, causing weakness, particularly affecting eye movement, facial expressions, speech, and ingestion.

Plaintiff's provider certification forms stated that he needed intermittent FMLA leave both because of temporary flare-ups of his symptoms, called exacerbations, and to attend medical appointments for infusion therapy. Plaintiff's documentation stated that his myasthenia gravis caused difficulty swallowing, weakness, slurred speech, double vision, and drooping eyelids. It also identified Plaintiff's need for infusion therapy and stated that he may need in-patient treatment during flare-ups.

Defendant approved intermittent FMLA leave for Plaintiff exactly as he requested it in

2022 and 2023, providing for leave for up to three flare-ups per month, lasting up to three days per episode, and for up to three office visits per month, requiring up to three days off for each visit.

Plaintiff's intermittent leave applied to his varied work schedule as follows: Plaintiff would monitor his place on the extra board and, as he neared the top of the board, would call in to inform Defendant that he needed to take FMLA during a period when he otherwise would expect to be called to work. Calls such as these would "mark off" Plaintiff from the board for three days, unless he called back sooner to "mark up" and return to the board.

In 2024, Defendant identified a notably high rate of absences among employees at the Kendleton depot, including employees marking off for intermittent FMLA, sick leave, and other reasons. Defendant noticed patterns in the timing of requests for intermittent FMLA: the requests occurred frequently on holidays, weekends, and before or after other scheduled days off.

Suspecting misuse of intermittent FMLA or other dishonesty, Defendant decided to investigate the absences because the high rate was significantly limiting its ability to fill train crews out of Kendleton. Defendant hired a private investigation firm to conduct surveillance of all Kendleton employees who called out from work in June 2024.

To conduct the investigations, Defendant's Human Resources Business Partner and former Employee Relations Manager Lesley Myers would be informed when a Kendleton employee called out from work. Ms. Myers then contacted the private investigation firm and provided the employees' names and home addresses, the reported reason the employees claimed to be unable to work, and other relevant information such as addresses for medical offices if appointments were cited as a basis for intermittent FMLA. The investigators then conducted surveillance of employees during their absences and provided a report to Defendant on the employees' conduct while away from work.

During June 2024, Plaintiff took FMLA leave from June 14 to June 17. Plaintiff received an infusion on June 18, and experienced side effects afterwards.[1] Plaintiff then took FMLA leave from June 19 to June 22.

Ms. Myers estimated that about 50 Kendleton employees were investigated for calling out in June 2024. While most employees were not subject to any further investigation or review based on the surveillance, information gathered during these investigations supported Defendant's suspicions related to Plaintiff and six other employees.

The CBA that governed the terms and conditions of Plaintiff's employment with Defendant included, among other things, a bargained-for notice and investigation ("CBA investigation") procedure that Defendant must follow if it suspects misconduct and before a Union member such as Plaintiff may be disciplined or dismissed. The procedure provides that the investigated employee, represented by the Union, may testify and present evidence, and representatives of the Company may also testify and present evidence.

On July 24, 2024, Plaintiff received notice of a CBA investigation concerning his suspected misuse of approved FMLA. The notice directed Plaintiff to appear at a hearing on July 31, 2024, "to ascertain [his] responsibility, if any, in connection with [his] alleged misconduct regarding misuse of approved FMLA between June 14, 2024[,] to June 17, 2024[,] and June 19, 2024[,] to June 22, 2024."

On July 29, 2024—five days after receiving notice of the CBA investigation and two days before the hearing—Plaintiff saw his doctor. During that visit, Plaintiff obtained a letter stating that since May 2024, his myasthenia gravis symptoms had improved and he was able to participate in low-impact exercise, including bicycle riding.

---

[1] Based on the parties' briefing, it does not appear Plaintiff took FMLA for his June 18 infusion.

6

Road Foreman Scott Stephens, presided over the hearing. Mr. Stephens had never met Plaintiff before the hearing. Mr. Stephens is based in Wisconsin and had no operational or supervisory responsibilities regarding Plaintiff or the Kendleton depot. At the hearing, Mr. Stephens asked Plaintiff why he needed intermittent FMLA. Plaintiff responded:

> It's for autoimmune disease called Myasthenia Gravis and when I have those exacerbations I get to where I can't chew, I can't swallow. That's my major symptoms. And we get slurry speech where I've—on my tongue. That's why I've basically got to rest and take medicine.

Ms. Myers was one of Defendant's witnesses at the CBA investigation. She presented evidence regarding Plaintiff's FMLA certification and submitted the private investigators' surveillance report dated July 15, 2024.

The surveillance report stated that Plaintiff was followed on June 15, 16, 19, 20, 21, and 22, during which time investigators "observed the subject going to restaurants, mowing his lawn, riding his bicycle, riding his tractor, socializing with neighbors and attending a party," and concluding that "[a]t no time did the subject appear ill." The investigator never spoke to Plaintiff or documented being close enough to observe whether his eyes were drooping.

Plaintiff admitted engaging in the activities described in the report but denied misusing FMLA. He also stated that on June 20, 2024, he saw someone he assumed was a private investigator watching his house. He assumed the investigator was probing FMLA misuse and had seen him riding his bicycle. Plaintiff submitted the July 29, 2024, letter from his doctor as an exhibit at the hearing.

Pablo Rodriguez, Director of Border Operations, was also one of Defendant's witnesses at the CBA investigation. He was present for Plaintiff's and Ms. Myers statements. Mr. Rodriguez applied GCOR 1.6 to the evidence presented at the hearing and stated it was his conclusion that Plaintiff violated GCOR 1.6 by misusing his approved intermittent FMLA.

Based on all evidence and testimony at the hearing, Mr. Stephens concluded that the Company proved Plaintiff had misused his approved FMLA leave in June 2024 and recommended that Plaintiff be terminated as a result of his misconduct. Mr. Stephens testified under oath that he arrived at this conclusion because he honestly believed that Plaintiff had misused his approved FMLA in June 2024 by taking FMLA on days when he did not legitimately need it, and not based on Plaintiff's FMLA use itself.

Mr. Stephens communicated his conclusion and recommendation to Division Superintendent Ricardo Hilario, who oversees the KCSR depot in Kendleton. Mr. Hilario reviewed the transcript of the hearing and the exhibits submitted by the Company and the Union and determined: "The charge of Misconduct regarding misuse of approved FMLA was substantiated. Ms. Myers proved [Plaintiff] performed strenuous activities. Based on the testimony and exhibits provided by [Company] witness [Ms.] Myers the substantiated charges warrant discipline per policy." On August 5, 2024, Mr. Hilario recommended Defendant's termination as provided by the Company's Hybrid Discipline and Accountability Guidelines.

Mr. Hilario testified under oath that he recommended termination because he honestly believed Plaintiff had misused his approved FMLA in June 2024. Mr. Hilario specifically noted the contradiction between Plaintiff's statement at the hearing that he must "rest and take medicine" during a flare-up and Plaintiff's documented physical activity in June 2024. Mr. Hilario testified that his recommendation was based on his belief that Plaintiff took FMLA on days when he did not legitimately need it, and not based on Plaintiff's FMLA use itself.

Mr. Hilario sent his recommendation to Senior Vice President Jason Ross, who is responsible for reviewing and approving employee discipline. Mr. Ross separately reviewed the CBA investigation transcript, and the recommendation of the others, and decided Plaintiff should

be terminated. This decision was exclusively Mr. Ross's. Like the others, Mr. Ross testified under oath that he decided to terminate Plaintiff because he honestly believed Plaintiff had been dishonest about and misused his FMLA in June 2024. Mr. Ross testified that he did not in any way decide to terminate Plaintiff because of his FMLA use itself. Mr. Ross also noted the contradiction between Plaintiff's statement at the hearing that he has to "rest and take medicine" during a flare-up and Plaintiff's documented physical activity. Mr. Ross was also suspicious of the timing of Plaintiff's July 29, 2024, doctor's letter stating he could participate in low-impact exercise, including bicycle riding.

At Mr. Ross's direction, Defendant sent Plaintiff a termination letter dated August 9, 2024, informing Plaintiff that his employment was terminated because "the transcript of the [CBA] investigation contains substantial proof" that he violated GCOR 1.6 and the FMLA Policy. At his deposition, Plaintiff acknowledged that Defendant based his termination on what it believed to be true and did not lie about its reason for terminating him.

Defendant was not singled out individually during Defendant's investigation of Kendleton employees' use of leave in June 2024. After surveilling nearly 50 employees, Defendant called six employees to CBA investigation hearings based on their activities observed during the same time period: S.C., D.G., A.H., L.H., M.P., and K.S.

As with Defendant's CBA investigation, Mr. Ross reviewed the hearing transcripts and evidence. Mr. Ross decided that the charges against S.C., D.G., L.H., and K.S. had been proven and so those employees should be terminated, and the charges against A.H. and M.P. had not been proven so they should be placed back in service without discipline. These employment decisions were exclusively Mr. Ross's.

9

Case 4:24-cv-00559-DGK    Document 51    Filed 07/10/25    Page 9 of 12

**Discussion**

Plaintiff argues that Defendant terminated him after taking approved FMLA leave in June 2024. Defendant contends Plaintiff's FMLA retaliation claim cannot survive the *McDonnell Douglas* framework.

The FMLA entitles employees to medical leave for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). "The FMLA authorizes two types of claims: interference or retaliation." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012). In asserting a retaliation claim, Plaintiff must allege Defendant discriminated against him for exercising his FMLA rights. *Id.* That is, "an employer may not consider an employee's use of FMLA leave as a negative factor in an employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006).

Because there is no direct evidence of retaliation, the Court evaluates Plaintiff's claims under the three-step framework laid out in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-05 (1973). At step one, Plaintiff bears the initial burden to establish a prima facie case of FMLA retaliation. *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 924 (8th Cir. 2014). If Plaintiff satisfies that burden, then at step two, the burden shifts to the employer to "articulate a legitimate, non-retaliatory reason for its action." *Id.* If the employer articulates a legitimate reason, then at step three, the burden returns to Plaintiff to show that the given reason is pretext for retaliation. *Id.* Plaintiff's FMLA retaliation claim does not survive this analysis.

Assuming for the sake of argument Plaintiff can establish a prima facie case for his claim, Defendant has articulated a legitimate, nondiscriminatory reason for terminating him, and Plaintiff has not established pretext. *See Kosmicki v. Burlington N. & Santa Fe R. Co.*, 545 F.3d 649, 651 (8th Cir. 2008) (assuming without deciding the Plaintiff had established a prima facie case but

holding that he failed to show pretext).

Here, Defendant stated that it terminated Plaintiff because, based on the evidence presented at the CBA investigation hearing, it honestly believed Plaintiff misused his intermittent leave and took FMLA on days he did not legitimately need it. Defendant determined this conduct violated GCOR 1.6. This is sufficient to establish a legitimate, nondiscriminatory reason for Plaintiff's termination. *See Ebersole*, 758 F.3d at 925 ("This court has consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." (citation modified)).

Because Defendant has established a legitimate, nondiscriminatory reason for its actions, the burden shifts to Plaintiff to show pretext. Thus, he must present sufficient evidence "show[ing] that the employer's proffered explanation has no basis in fact . . . [or] the employer varied from its normal policy or practice to address the employee's situation." *Hite*, 446 F.3d at 867.

Plaintiff does not carry this burden. He offers no evidence that Defendant's proffered reason is pretextual or a "dissembling to cover up a discriminatory purpose." *See id.* Instead, Plaintiff contends that Defendant reached the wrong conclusion and asks the Court to agree. However, it is not the Court's role "to decide whether that reason was wise, fair, *or even correct*, ultimately, so long as it truly was the reason for the Plaintiff's termination." *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998) (emphasis added). Plaintiff has not demonstrated that Defendant's stated reason for termination was not its actual reason. In fact, Plaintiff testified that Defendant based his termination on what it believed to be true. Furthermore, there is no evidence that the CBA investigation was rote or mechanical, as shown by the fact that Plaintiff was not singled out and not all investigations led to termination.

Accordingly, because Defendant has articulated a legitimate, nondiscriminatory reason for

11

terminating him, and Plaintiff has not established pretext, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## Conclusion

For the forgoing reasons, Defendant's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Date:  July 10, 2025               /s/ Greg Kays                .
                                   GREG KAYS, JUDGE
                                   UNITED STATES DISTRICT COURT

12

Case 4:24-cv-00559-DGK   Document 51   Filed 07/10/25   Page 12 of 12